UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
SPYROS AVLONITIS,

                    Plaintiff,                  **FINDINGS OF FACT &**
                                                            **CONCLUSIONS OF LAW**
      - against -                                  16-CV-2521 (PKC) (SMG)

UNITED STATES OF AMERICA,

                    Defendant.
---------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

      Plaintiff Spyros Avlonitis brought this action against Defendant United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, for personal injuries sustained as a result of an automobile collision on April 22, 2015. A bench trial was held on June 10 and 11, 2019. (June 10, 2019 Minute Entry; June 11, 2019 Minute Entry.) The parties thereafter submitted proposed findings of fact and conclusions of law. (Dkts. 41, 42.) Based on a review of the testimony and evidence introduced at trial, as well as the parties' post-trial submissions, the Court renders the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. *See* Fed. R. Civ. P. 52(a)(1) ("In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."). For the reasons set forth below, the Court finds in favor of Defendant.

## FINDINGS OF FACT

### I. The Collision

      On April 22, 2015, Plaintiff, driving a 2008 Volkswagen, and United States Postal Service ("USPS") employee Damissha Linval, driving a "two-ton" USPS truck, were involved in an automobile collision. (Trial Transcript ("Tr.") at 13:13–18, 14:11–14, 129:14–25, 130:4–6.) The collision occurred near the corner of 47th Street and Broadway in Queens, New York. (*Id.* at

14:23–15:13.)

At approximately 3:00 p.m., Plaintiff was driving on 47th Street towards the intersection with Broadway. (*Id.* at 15:14–15:16, 137:15–17.) On this block, 47th Street has one lane of traffic and two rows of parked cars on either side. (*Id.* at 15:17–25, 131:19–24, 132:5–7; *see also* Defendant's Exhibit ("Def.'s Ex.") C2.) The traffic on this block is one-way. (Tr. at 15:17–19.) There was no traffic on 47th Street at the time of the accident, and nothing obstructed Plaintiff's view of the road. (*Id.* at 17:22–18:3.) Plaintiff's vehicle was moving between approximately 15 and 20 miles per hour, and he was wearing a seatbelt. (*Id.* at 25:5–6, 65:8–16.) The postal truck was parked halfway up the block on the left side of the road, in line with the row of parked cars. (*Id.* at 134:10–135:4.) At no point did Plaintiff see the truck move. (*Id.* at 19:19–22.) Immediately before the accident, Plaintiff looked ahead and saw that the traffic signal at the intersection of 47th Street and Broadway was green. (*Id.* at 20:21–21:2.) Plaintiff attempted to drive past the postal truck and through the intersection. (*Id.* at 18:7–12.)

At around 3:00 p.m. on April 22, 2015, USPS employee Linval was completing a delivery at 32-06 47th Street. (*Id.* at 137:15–17.) It was Linval's third time driving a two-ton USPS truck. (*Id.* at 164:24–165:8.) After finishing the delivery, she climbed back into the two-ton USPS truck, shut the door, and fastened her seatbelt. (*Id.* at 137:21–137:25.) She then checked the truck's three mirrors and, when she did not see any approaching vehicles, began "inching out" into the flow of traffic.[1] (*Id.* at 138:1–4, 139:1–3, 139:17–18.) The mirrors on the two-ton USPS truck do not allow the driver to see everything on the right side of the truck. (*Id.* at 140:21–141:4.)

---

[1] Linval also testified that she turned on her "right-hand side directional" as she began pulling out. (Tr. at 141:10–15.) However, on cross-examination, Linval acknowledged that she did not specifically remember whether she turned on the signal but that she was "almost positive that [she] did . . . [because] it's what [she] always do[es]." (*Id.* at 162:17–21.) Defendant argued

2

As Linval was pulling out from the curb, at around 3:05 p.m. on April 22, 2015, the front left side of Plaintiff's car and the front right wheel of the postal truck collided. (*Id.* at 130:4–8, 143:25–144:22, 145:15–17.) The damage to Plaintiff's vehicle primarily consisted of a flat tire and scratches in the front left area. (*Id.* at 55:4–15, 173:11–13.) The USPS truck was largely undamaged, save for some scratches to the lug nuts on the front right wheel. (*Id.* at 145:2–17, 174:9–18; *see also* Def's Ex. C8.)

After the collision, Plaintiff drove his car past the postal truck to the intersection of 47th Street and Broadway, and proceeded to park on the left-hand side of the street to get out of the way of traffic. (Tr. at 22:12–17, 55:25–56:5.) Immediately after parking, Plaintiff exited his car and walked to the postal truck, where Linval was located. (*Id.* at 56:6–11.)

Linval called her manager, Marie Entrades, the supervisor that day, Judy Caserta, and the police, per USPS protocol. (*Id.* at 147:19–148:13, 170:19–24.) Entrades arrived at the scene at around 3:30 p.m. (*Id.* at 172:8–18.) After arriving, Entrades asked Plaintiff if he was okay, to which Plaintiff replied in the affirmative, stating that he did not require medical attention. (*Id.* at 25:15–23, 175:8–16.) Entrades gave Linval an accident report form and a blank piece of paper on which to write her statement. (*Id.* at 178:2–7.) Entrades also used her phone to take pictures at the scene. (*Id.* at 184:2–7; *see also* Def's Ex. C.)

The police arrived at the scene after approximately two and a half hours. (Tr. at 180:15.) While waiting, Plaintiff repeatedly walked back and forth, smoked cigarettes, got into and out of

---

in a written submission that, pursuant to Federal Rule of Evidence 406, Linval's statement regarding her "habit" of using her turn signals should be admitted. (*See id.* at 213:14–25; *see also* Defendant's Letter Motion, Dkt. 37.) But, as the Court noted on the second day of trial, the Court accords minimal weight to Linval's testimony regarding whether she turned on her signal, given that it was only the third time she was operating this particular type of truck, and, "as a matter of common sense[,] . . . she might not have followed the same habit because she was in an entirely new surrounding, vis-à-vis the vehicle that she was operating." (Tr. at 214:23–215:6.)

3

his car without assistance, and made phone calls. (*Id.* at 56:12–14, 57:2–18, 146:25–147:16, 149:2–18.) After some time, Plaintiff walked down the block and across Broadway to meet his then-girlfriend and now wife, Anais Avlonitis, so that she could give him his insurance card and registration. (*Id.* at 58:12–23, 118:14–17, 176:16–23.) Even though Ms. Avlonitis offered to wait with Plaintiff at the accident scene, Plaintiff insisted that it was not necessary and that he "[would] be okay." (*Id.* at 58:24–59:4, 120:1–5.) At the time, Ms. Avlonitis did not notice any injuries on Plaintiff; at most, he seemed slightly pale. (*Id.* at 119:2–8.) Approximately two hours after the accident, Plaintiff called 911 for an ambulance. (*Id.* at 60:7–20.)

## II. Plaintiff's Medical Treatment

Plaintiff was transported via ambulance to Elmhurst Hospital, where he complained of neck pain, headache, nausea, and dizziness. (*Id.* at 26:20–23; Def.'s Ex. E, at 4.) After an examination, Elmhurst Hospital staff concluded that Plaintiff had no head trauma and a normal neurological exam. (Def.'s Ex. E, at 8.) Plaintiff also underwent a CT scan of his cervical spine that showed no evidence of a cervical spine fracture, no disc disease or joint arthritis, and no soft tissue injuries. (*Id.* at 30; *see also* Tr. at 60:21–23.) Plaintiff was discharged from the hospital at around 1:00 a.m. on April 23, 2015. (Tr. at 28:3–5; *see also* Def.'s Ex. E, at 7.) At discharge, Plaintiff was alert and oriented, with vital signs in normal limits, and reported a pain level of zero. (Def.'s Ex. E, at 7.) Plaintiff left the hospital, unaccompanied, in a taxi. (Tr. at 28:6–9; Def.'s Ex. E, at 7.) Plaintiff's discharge papers stated that he could return to work in two days. (*See* Def.'s Ex. E, at 25.)

Later that day, Plaintiff met with both an attorney and Dr. Christopher Kyriakides. (Tr. at 28:16–18, 70:19–21, 71:1–16; Plaintiff's Exhibit ("Pl.'s Ex."), at 2.) Plaintiff has known Dr. Kyriakides for "a long time," as a customer at the restaurant where Plaintiff was working. (Tr. at 28:16–18.) At his appointment with Dr. Kyriakides, Plaintiff complained of pain, mainly in his

4

neck as well as sporadically in his shoulder. (*Id.* at 29:3–7.) Dr. Kyriakides prescribed pain medication, physical therapy, and trigger point[2] injections. (*Id.* at 29:15–30:6, 71:17–19.) Plaintiff went to physical therapy for "at least six months." (*Id.* at 29:20–24.)

Plaintiff also underwent diagnostic testing at Dr. Kyriakides's suggestion. (Pl.'s Ex. 2.) On May 15, 2015, Plaintiff underwent an MRI of his cervical spine conducted by Thomas Kolb, M.D., who reported that Plaintiff had sustained disc herniations at C3-C4 and C5-C6 that were impinging on the thecal sac.[3] (Pl.'s Ex. 5.) Dr. Kolb also found that the discs were of normal height. (*Id.*) On June 22, 2015, Plaintiff underwent an MRI of his lumbar spine conducted by Jacob Lichy, M.D., who reported that Plaintiff had herniations at L4-L5 and L5-S1. (Pl.'s Ex. 6.) Finally, Plaintiff underwent electrodiagnostic testing on July 8, 2015. (Pl.'s Ex. 3.) Debra Ibrahim, D.O., conducted this testing and found that Plaintiff suffered from bilateral L5 radiculopathy. (*Id.*)

On September 9, 2015, Plaintiff was examined by Dr. Andrew Miller, an orthopedic surgeon. (Tr. at 74:12–20, 322:1.) Dr. Miller concluded that Plaintiff had neck and back sprains that had resolved and that there was no orthopedic disability of any kind. (*Id.* at 322:8–322:13.)

On September 12, 2016, Plaintiff was examined by Dr. David Adin, who Plaintiff called as an expert witness at trial.[4] (*Id.* at 220:20–223:11, 226:17–227:3.) Plaintiff was referred to Dr. Adin by Dr. Kyriakides. (*Id.* at 34:5–6; 72:12–14, 235:9–11.) At this initial appointment with Dr. Adin, Plaintiff complained of neck pain following the accident on April 22, 2015. (*Id.* at 222:20–

---

[2] Trigger point injections are injections into the soft tissue that deliver medicine directly into an area that is experiencing pain. (Tr. at 365:18–25.)

[3] The "thecal sac" is another term for the spinal cord. (Tr. at 358:3–4.)

[4] Dr. Adin was qualified as an expert in pain management. (Tr. at 226:15–227:3.)

5

223:11.) Physical examinations on September 12 and October 17, 2016 showed that Plaintiff was neurologically normal, but that there were deficits in the range of motion of Plaintiff's neck. (*Id.* at 224:2–11, 225:9–22.) Specifically, Plaintiff had a positive "Spurling's Maneuver[5] to the right side" and "deficits in range of motion of his cervical spine." (*Id.* at 224:6–8; *see also id.* at 241:16–25.) Dr. Adin found the deficits in Plaintiff's range of motion to be significant. (*Id.* at 246:2–6.) On December 6, 2016, Dr. Kyriakides performed EMG/NCV testing that showed that Plaintiff had C5-C6 radiculopathy, meaning that Plaintiff had some impingement on his nerves. (*Id.* at 236:12–237:9.)

Based on his two examinations, Dr. Adin performed a percutaneous discectomy on Plaintiff's cervical spine at C3-C4 and C5-C6 on December 28, 2016. (*Id.* at 224:17–24, 232:6–12.) A percutaneous discectomy is a procedure in which a needle is inserted into a disc in order to remove fluid or a disc fragment. (*Id.* at 278:16–21, 364:5–13.) It is considered an investigational procedure, though it can result in pain relief for some patients. (*Id.* at 224:23–24, 234:20–22, 279:14–280:8.) Dr. Adin did not see Plaintiff after performing the percutaneous discectomy; Plaintiff instead was seen by an associate, Miguel Coba, on October 17, 2016. (*Id.* at 225:9–12.) Plaintiff's physical exam results were "essentially unchanged" on that date. (*Id.* at 225:17–22.) Dr. Adin testified that he could not opine as to whether Plaintiff's injuries were permanent, given that he had not seen Plaintiff since 2016. (*See id.* at 249:21–25, 251:14–17.)

At trial, Dr. Adin opined with a reasonable degree of medical certainty that Plaintiff's cervical disc herniation and cervical radiculopathy were caused by the April 22, 2015 accident.

---

[5] A Spurling's Maneuver is a clinical test to assess whether there is an irritated or compromised nerve root in the neck, and is conducted by positioning the head in certain ways. (Tr. at 240:6–8.) A positive test produces pain. (*Id.* at 240:8.) Because the test relies on a patient's reporting of pain, it is not an objective test. (*Id.* at 240:10–14.)

(*Id.* at 237:21–238:2.) Dr. Adin based his opinion on Plaintiff's history and clinical care. (*Id.* at 238:3–4.) However, Dr. Adin did not know that Plaintiff had been involved in a car accident before the April 22, 2015 accident or that Plaintiff had a history of being a powerlifter, as a result of which he regularly lifted over 700 pounds. (*Id.* at 238:5–8, 271:5–18.) Dr. Adin also acknowledged that he had not reviewed pictures of Plaintiff's car from the April 22, 2015 accident. (*Id.* at 273:13–15.) Dr. Adin testified that the information regarding Plaintiff's prior accidents and powerlifting did not change his opinion. (*Id.* at 273:16–20, 285:8–286:12.) Rather, Dr. Adin agreed that his opinion as to the cause of Plaintiff's injuries was based almost exclusively on the timing of his reported symptoms. (*Id.* at 286:18–22.) As alluded to at trial, the Court does not credit Dr. Adin's testimony regarding causation, given that he was only qualified as an expert in pain management and could not, in his own words, "offer a world view of [Plaintiff]." (*Id.* at 277:18–278:2; *see also id.* at 247:10–25.)

Plaintiff was also examined by Defendant's expert, Dr. Sheeraz Qureshi,[6] on May 17, 2017. (*Id.* at 308:15–22; *see also id.* at 305:3–18.) At that examination, Plaintiff complained of right-sided neck pain. (*Id.* at 309:5–9.) He did not complain of pain radiating into his arms. (*Id.* at 361:17–22.) Dr. Qureshi performed a standard range of motion exam that showed a reduction in Plaintiff's range of motion for extension and flexion, but no restriction rotationally. (*Id.* at 314:4–7.) Dr. Qureshi also performed a "functional" range of motion test. (*Id.* at 314:11–25.) Rather than asking a patient to move his neck until the patient feels pain, as is the standard method for testing range of motion, Dr. Qureshi explained that he would try to "make what [he] think[s] are reasonable estimates of motion" by watching how well the patient is able to follow Dr. Qureshi as he moves around the room or whether the patient struggles to take off an article of clothing. (*Id.*

---

[6] Dr. Qureshi was qualified as an expert in spine surgery. (Tr. at 305:17–18.)

7

at 312:3–21.) Dr. Qureshi testified that he found this type of test to be more accurate and provide a "reasonable estimate of motion," as compared to the typical range of motion tests that rely on a patient's report of pain, which provides no way for the "examiner to know what is really . . . the ability of a person to bend their neck." (*Id.*) Plaintiff's functional exam showed that there were some differences from the range of motion results found by Plaintiff's physicians based on the standard range of motion tests, and that Plaintiff's functional range of motion was "reasonable" at the time Dr. Qureshi examined him. (*Id.* at 314:14–25, 315:4–7.) Specifically, Dr. Qureshi found that Plaintiff's "range of motion was within what [Dr. Qureshi] would consider a functional range[,] which is that . . . somebody would be able to drive or sleep or . . . participate in activities of what [Dr. Qureshi] would consider kind of normal life without limitation due to range of motion specifically." (*Id.* at 314:20–25.) Dr. Qureshi also found no abnormalities in Plaintiff's lumbar spine exam. (*Id.* at 317:24–25.) After examining Plaintiff, Dr. Qureshi reviewed Plaintiff's MRI films and disagreed with Drs. Kolb and Lichy as to Plaintiff's condition, finding that Plaintiff's MRIs revealed disc bulges, rather than herniations, and noting that some doctors used the terms interchangeably. (*Id.* at 330:11–12, 332:9–24, 335:1–7, 338:18–22, 341:10–11, 355:11–12, 360:13–17.) The Court credits Dr. Qureshi's testimony that, given his expertise in the spine, he is "in a better position" to interpret Plaintiff's MRIs than are Drs. Kolb and Lichy, who are radiologists. (*Id.* at 391:1–5.)

Based on his review of Plaintiff's medical records, his physical examination of Plaintiff, and other relevant records, Dr. Qureshi opined that, to a reasonable degree of medical certainty, there was no "causal relationship" between Plaintiff's cervical or lumbar issues and the April 22, 2015 accident. (*Id.* at 366:1–9.) Dr. Qureshi opined that Plaintiff's injuries were caused by "wear and tear[,] more from just [a] lifestyle of heavy lifting, partially smoking . . . as opposed to a

8

trauma." (*Id.* at 366:11–13; *see also id.* at 307:15–308:14, 401:25–403:6.) The Court credits Dr. Qureshi's opinion, as it is based on his interpretation of Plaintiff's MRI films and a thorough review of all relevant records.

III.    **Plaintiff's Injuries**

Plaintiff testified that, prior to the April 22, 2015 accident, he was a powerlifter, lifting around three times a week. (*Id.* at 86:3–18.) Plaintiff would regularly perform deadlifts as part of his exercise regime, lifting as much as 700 pounds. (*Id.* at 86:19–87:10.) Plaintiff infrequently performed squats and bench presses. (*Id.* at 88:2–15.) On direct examination, Plaintiff testified that, as a result of the accident, he is unable to powerlift, ride a bicycle, or "run around as much as [he] used to" at his restaurant. (*Id.* at 42:8–20; *see also id*. at 43:16–20 (noting that driving "is kind of a pain," and that he is no longer able to scuba dive).) Plaintiff also testified that he is "just exhausted all the time" because he is unable to sleep due to pain in his neck. (*Id.* at 43:8–11.) However, on cross-examination, Plaintiff contradicted some of his earlier testimony, acknowledging that since the accident he has been able to work, drive a car, ride a bicycle for short distances, and travel to Greece twice, which required sitting on an airplane for eight hours each way. (*Id.* at 75:3–76:20.) Furthermore, although Plaintiff presented evidence that he had limited range of motion in his neck, the Court observed, and noted in the record during trial, that Plaintiff demonstrated both flexion and extension of his neck by resting his chin on his chest and extending his head more than 50 degrees while sitting, and sometimes sleeping, at the plaintiff's side table. (*Id.* at 293:10–15.) Plaintiff also acknowledged during his testimony that in the eight months preceding the bench trial, he had neither sought nor received any treatment for his alleged injuries. (*Id.* at 37:10–14.)

## CONCLUSIONS OF LAW

**I.     FTCA and New York State Law**

Plaintiff brings his claim pursuant to the FTCA, which provides for recovery

> for . . . personal injury . . . caused by the negligent . . . act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also Molzof v. United States*, 502 U.S. 301, 305 (1992) (noting that "the extent of the United States' liability under the FTCA is generally determined by reference to state law").

"Because the motor vehicle collision underlying this action occurred in New York, New York tort law applies." *Hyacinthe v. United States*, No. 05-CV-1363 (KAM) (VVP), 2009 WL 4016518, at *6 (E.D.N.Y. Nov. 19, 2009) (internal record citation omitted) (citing *Eerie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Rand v. Volvo Finance North America*, No. 04–CV–349 (DLI) (KAM), 2007 WL 1351751, at *1 (E.D.N.Y. May 8, 2007)). "Under New York law, the elements of a negligence claim are: (i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002); *Solomon v. City of New York*, 489 N.E.2d 1294, 1294–95 (N.Y. 1985). Additionally, "New York's 'no-fault' insurance laws place limits on any recovery by a person involved in an automobile accident." *Madden v. Lee*, No. 01-CV-7856 (GWG), 2002 WL 31398951, at *3 (S.D.N.Y. Oct. 25, 2002). Specifically, "[t]o recover for non-economic losses resulting from a vehicle accident in New York, a plaintiff must demonstrate that [he] suffered a 'serious injury' under New York's No–Fault Insurance Law." *Williams v. United States*, 597 F. App'x 647, 648 (2d Cir. 2015) (summary order) (quoting N.Y. Ins. Law § 5104(a)); *see also Hyacinthe*, 2009 WL 4016518, at *9 ("New York's No–Fault Law also allows plaintiffs to recover

for any non-economic loss, *i.e.*, pain and suffering, but only if the plaintiff sustained a 'serious injury.'") (quoting N.Y. Ins. Law § 5104(a)). A plaintiff must prove his FTCA claim by a preponderance of the evidence. *See Seales v. United States*, No. 15-CV-6969 (CLP), 2019 WL 7753451, at *22 (E.D.N.Y. Oct. 21, 2019).

### A. "Serious Injury" Under New York Law

Whether Plaintiff's injuries qualify as a "serious injury" pursuant to New York law is "a threshold question for the court to decide." *Rivera v. United States*, No. 10-CV-5767 (MHD), 2012 WL 3132667, at *10 (S.D.N.Y. July 31, 2012) (quoting *Yoncr Qin Luo v. Mikel*, 625 F.3d 772, 776–77 (2d Cir. 2010)). "Serious injury" is defined as

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d). "The burden of proving a serious injury rests upon the party seeking additional recovery." *Hyacinthe*, 2009 WL 4016518, at *9 (internal quotation marks and citation omitted). Plaintiff asserts that he sustained a serious injury because the evidence shows that he has both "a permanent consequential limitation of use of a body organ or member" (Plaintiff's Brief ("Pl.'s Br."), Dkt. 42, at ECF[7] 2), and "a significant limitation of use of a body function or system" (*id.* at ECF 4). The Court finds that Plaintiff's assertions are not supported by a preponderance of the evidence.

---

[7] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

11

"Because there is significant overlap with 'consequential limitation' and 'significant limitation,' they are treated together." *Williams v. United States*, No. 09-CV-933 (GLS) (CFH), 2014 WL 11460892, at *8 (N.D.N.Y. Jan. 28, 2014) (citing *Toure v. Avis Rent A Car Sys., Inc.*, 774 N.E.2d 1197, 1200–02 (N.Y. 2002)), *aff'd*, 597 F. App'x 647 (2d Cir. 2015) (summary order). "In the context of the N.Y. Insurance Law, the term 'consequential' means 'important' or 'significant.'" *Tsveitel v. Geoghegan*, No. 05-CV-5721 (DGT), 2009 WL 2182379, at *5 (quoting *Kordana v. Pomellito*, 503 N.Y.S.2d 198, 200 (N.Y. App. Div. 1986)). "With the exception that the plaintiff prove permanence to satisfy the 'consequential limitation' definition, 'significant limitation' is essentially identical." *Williams*, 2014 WL 11460892, at *8 (citing *Lopez v. Senatore*, 484 N.E.2d 130, 131 (N.Y. 1985)). "[W]hether a limitation of use or function is 'significant' or 'consequential' (i.e., important . . .) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Toure*, 774 N.E.2d at 1201 (footnote omitted) (quoting *Dufel v. Green*, 647 N.E.2d 105, 107 (N.Y. 1995)). Thus, a plaintiff must demonstrate "something more than . . . a minor, mild or slight limitation of use." *Ventra v. United States*, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000) (quoting *Licari v. Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982)). A plaintiff "must present objective medical evidence to support their claims." *Seales*, 2019 WL 7753451, at *24; *see also Hyacinthe*, 2009 WL 4016518, at *10.

Plaintiff rests his serious injury claims on the disc herniations in his cervical and lumbar spine. (Pl.'s Br., Dkt. 42, at ECF 3–4.) However, "[t]he existence of herniated discs and bulging discs alone are not enough [to show 'serious injury' under New York law] absent any objective evidence of Plaintiff's resulting physical limitations." *Gay v. Cevallos*, No. 10-CV-949 (LMM), 2011 WL 2015528, at *7 (S.D.N.Y. May 17, 2011) (citing *Kearse v. N.Y.C. Transit Auth.*, 789

N.Y.S.2d 281, 285 (N.Y. App. Div. 2005) ("[A] disc bulge or herniation must be accompanied by objective evidence of the extent of alleged physical limitations resulting from the disc injury.")); *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003) ("We note that 'herniated or bulging discs do not per se meet the statutory threshold of serious physical injury,' without 'objective evidence of the extent or degree of the alleged physical limitations resulting from the injuries and their duration.'") (quoting *Rose v. Furgerson*, 721 N.Y.S.2d 873, 876 (N.Y. App. Div. 2001)).

Plaintiff asserts that his disc herniations have limited the range of motion in his neck and back. (Pl.'s Br., Dkt. 42, at ECF 4–5.) He supports these claims with his own reports of pain and the range of motion tests conducted by Drs. Adin and Qureshi. (*Id.*) "A plaintiff's subjective claim of pain and limitation of motion must be sustained by verified objective medical findings." *Hyacinthe*, 2009 WL 4016518, at *10 (internal quotation marks and citations omitted). On its own, "the loss of ROM [range of motion] 'is insufficient to support an objective finding of a serious injury' 'because it is dependent on the patient's subjective expressions of pain.'" *Williams*, 2014 WL 11460892, at *9 (quoting *Gillick v. Knightes*, 719 N.Y.S.2d 335, 336 (N.Y. App. Div. 2001)). Here, Plaintiff provides no objective evidence to support his claims of deficits in his range of motion. As Plaintiff's expert, Dr. Adin, admitted, the range of motion tests that Dr. Adin performed on Plaintiff were subjective because they relied on Plaintiff's reports of pain. (Tr. at 261:19–24.) Although the objective evidence in the record, specifically the May and June 2015 MRIs, show that Plaintiff has bulging discs in his cervical and lumbar spine, no evidence was introduced at trial to suggest that these types of injuries would lead to deficits in his range of motion.[8] (*Cf.* Tr. at 336:7–15 (noting that the MRI of Plaintiff's cervical spine is the "sort of a

---

[8] Plaintiff also introduced EMG tests from July 2015 and December 2016 suggesting that he suffers from cervical and lumbar radiculopathy. (*See* Pl.'s Ex. 3; Tr. at 236:12–237:9.)

picture [that] usually either goes along with somebody who's asymptomatic or somebody who has chronic neck discomfort or pain"); *id*. at 336:17–25 (clarifying that there was nothing in Plaintiff's MRI that suggests that "this person must be in a lot of pain" but rather that "this picture we think more about just like a discomfort, like it's uncomfortable when [the patient] move[s] [his] neck around").) As Dr. Qureshi explained, "some patients can have full range of motion with bulging discs . . . ." (*Id.* at 389:23–24.) Therefore, without objective evidence that specifically supports Plaintiff's claims of deficits in his range of motion, Plaintiff has not met his evidentiary burden to prove his serious injury claim. *See Ventra*, 121 F. Supp. 2d at 334 (finding that plaintiff did not suffer from a serious injury when "there [was] no objective evidence of a significant limitation" and "limitation[s] in [plaintiff's] range of motion . . . were based on her subjective responses rather than objective criteria").

Furthermore, the Court has serious doubts as to whether Plaintiff in fact has any significant or consequential limitation. Both Dr. Qureshi and Dr. Adin testified that a patient with Plaintiff's reported range of motion results would have a significant limitation in his movements. (Tr. at 241:11–242:2 (Dr. Adin); *id.* at 385:12–16 (Dr. Qureshi).) However, there is substantial evidence

---

However, Plaintiff, when meeting with Dr. Qureshi on May 17, 2017 (the most recent medical exam submitted into evidence), Plaintiff stated that "he didn't have [pain radiating in his arms, *i.e.*, radiculopathy] at the time that [Dr. Qureshi] examined him." (Tr. at 361:17–20.) Dr. Qureshi found it "notable" that Plaintiff "was very clear that his pain had always been the neck pain, not involving arm pain." (*Id.* at 361:20–22.) Dr. Qureshi's own examination of Plaintiff did not reveal any evidence of radiculopathy. (*Id.* at 362:3–8.) At trial, though Plaintiff testified about pain that could be symptomatic of radiculopathy (*see id.* at 40:14–22 (noting that his left shoulder felt numb)), he did not specifically testify that he was still experiencing pain as a result of radiculopathy, nor did he offer any evidence showing that his cervical radiculopathy significantly or consequentially limited his ability to use his neck, shoulder, or arm. Furthermore, in his post-trial briefing, Plaintiff only mentioned his cervical radiculopathy once in passing (Pl.'s Br., Dkt. 42, at ECF 3) and focused his serious injury claims on the tests showing deficits in his neck's range of motion (*see id.* at ECF 4–5). Accordingly, the Court does not find that the EMG tests suggesting radiculopathy provide the objective evidence Plaintiff needs to support his serious injury claim.

that Plaintiff's range of motion is not as limited as his test results indicate. Dr. Qureshi, for example, noted that his informal "functional" range of motion tests suggested that Plaintiff did not have any significant limitations. (Tr. at 314:14–25, 315:4–7.) Furthermore, Plaintiff testified that he had not sought treatment in the eight months leading up to the trial. (*Id.* at 37:10–14.) "[W]hile a cessation of treatment is not dispositive . . . a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." *Evans v. United States*, 978 F. Supp. 2d 148, 172–73 (E.D.N.Y. 2013) (quoting *Pommells v. Perez*, 830 N.E.2d 278, 283 (N.Y. 2005)). Plaintiff did not provide an explanation for why he had not sought further treatment. Finally, the Court's own observations of Plaintiff at trial likewise do not support Plaintiff's claim. Plaintiff's serious injury claim rests on the argument that his disc herniations have significantly impacted the range of motion in his neck. (*See* Pl.'s Br., Dkt. 42, at ECF 2–5.) However, as previously noted, the Court itself observed Plaintiff at trial demonstrating full flexion and extension of his neck throughout the proceeding. (Tr. at 293:1–9 (noting that "[Plaintiff's] head at various points was what I would, as a layperson, say, [was] fully flexed, namely his chin was resting on his chest or very close to his chest and that at different points, his head was extended I would estimate more than 50 degrees . . . .").) Likewise, Dr. Qureshi also noted that he saw Plaintiff at trial moving his neck more than he did during his range of motion tests with Dr. Qureshi in May 2017. (*Id.* at 385:2–8 (noting that "just sitting here, I could, I saw him, saw him leaning his neck back greater than 20 degrees," which was the point past which Plaintiff had said he could not move during his range of motion test).) As Dr. Qureshi credibly testified, "a patient with a serious neck injury . . . would be inhibited from [moving their head all the way back with their nose to the ceiling] because they would get a pain trigger that just wouldn't allow them to do it." (Tr. at 366:23–367:8.) This evidence, considered individually and

15

collectively, leads the Court to conclude that Plaintiff is not suffering from a significant or consequential limitation in his neck, and also casts doubt on the credibility of Plaintiff's reports of pain to his doctors, as well as his testimony before the Court at trial.

Accordingly, the Court finds that Plaintiff has not demonstrated by a preponderance of the evidence that the injury he claims to have sustained from the April 22, 2015 accident qualifies as a "serious injury" as defined under New York law.

### B. Causation

Moreover, even assuming *arguendo* that the evidence supported Plaintiff's claim that he suffers from a serious injury, Plaintiff would still not be able to recover because there is no evidence supporting Plaintiff's assertion that his injury was caused by the April 22, 2015 accident. "In order to recover damages for non-economic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue . . . ." *Evans*, 978 F. Supp. 2d at 172 (quoting *Carter v. Full Serv., Inc.*, 815 N.Y.S.2d 41, 43 (N.Y. App. Div. 2006)). Here, the only credible evidence as to causation does not support Plaintiff's contention that his injuries were caused by the April 22, 2015 accident. Dr. Qureshi opined, with a reasonable degree of medical certainty, that there was no "causal relationship" between Plaintiff's cervical or lumbar issues and the April 22, 2015 accident (Tr. at 366:1–9), but rather that Plaintiff's injuries were caused by "wear and tear[,] more from just [a] lifestyle of heavy lifting, partially smoking . . . as opposed to a trauma" (*id.* at 366:11–13; *see also id.* at 307:15–308:14, 401:25–403:6).

Plaintiff's expert testified to the contrary. However, though Dr. Adin testified that Plaintiff's injuries were caused by the April 22, 2015 accident, as previously noted, the Court does

16

not credit Dr. Adin's testimony, given that he was only certified as an expert in pain management and has minimal expertise in the spine. (*See id.* at 247:10–14; *cf.* 217:19–220:25.) Furthermore, Dr. Adin agreed that his "opinion on causation is based almost exclusively on the timing of when [Plaintiff] reported his symptoms" (*id.* at 286:19–22), and did not consider Plaintiff's history of being a weight lifter or prior car accidents (*id.* at 238:5–8, 271:5–18). In itself, Dr. Adin's failure to account for these aspects of Plaintiff's history or explain in detail why they should be disregarded significantly undermines the reliability of his opinion and the weight it should be given. "In the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation insufficient to support a finding that such a causal link exists." *Evans*, 978 F. Supp. 2d at 172 (quoting *Carter*, 815 N.Y.S.2d at 43) (citing *Montgomery v. Pena*, 798 N.Y.S.2d 17, 18 (N.Y. App. Div. 2005) (granting the defendant's motion for summary judgment in part because the plaintiff's physician "fail[ed] to give any objective basis for concluding that plaintiff's alleged limitations result[ed] from the [motor vehicle] accident, rather than . . . [her] prior injuries or preexisting conditions")); *see also Navedo v. Jaime*, 822 N.Y.S.2d 43, 46 (N.Y. App. Div. 2006) (affirming dismissal where, despite MRI reports showing bulging or herniated discs, plaintiffs' experts failed to "causally relate plaintiffs' orthopedic deficits to the accident"). Furthermore, Plaintiff did not offer any other evidence to rebut Dr. Qureshi's conclusion that his injuries were the result of wear and tear rather than a result of the April 22, 2015 accident. *See Gay*, 2011 WL 2015528, at *6 (finding that plaintiff raised no triable issue of fact when he did not rebut defendant's experts' testimony that plaintiff's injuries were the result of longstanding degenerative changes, and not the accident at issue).

Accordingly, there is no credible evidence supporting Plaintiff's claim that his injuries were caused by the April 22, 2015 accident. The Court therefore finds that Plaintiff has failed to prove his claim of negligence by a preponderance of the evidence and is precluded from recovering damages.[9]

**CONCLUSION**

Based upon the foregoing findings of fact and conclusions of law, the Court grants judgment in favor of the United States. The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 13, 2020
      Brooklyn, New York

---

[9] Given that the Court finds that Plaintiff has failed to show that his injuries were caused by the April 22, 2015 accident, it declines to rule on the other two elements of Plaintiff's negligence claim. *See Lopez v. United States*, 312 F. Supp. 3d 390, 401 (S.D.N.Y. 2018) ("In these circumstances, the Court declines to rule on who was negligent, as between [p]laintiff and [non-party], since such ruling is not necessary to the outcome of this case.").